NORMAN W. GLASGOW *v.* W. LUTHER HALL ET UX.

[No. 427, September Term, 1974.]

*Decided February 18, 1975.*

The cause was argued before MENCHINE, LOWE and MELVIN, JJ.

*William A. Ehrmantraut,* with whom were *Donahue & Ehrmantraut* on the brief, for appellant.

*Ferdinand J. Mack,* with whom were *Shadoan & Mack* on the brief, for appellees.

LOWE, J., delivered the opinion of the Court.

Norman Glasgow, an attorney whose proficiency was greatest in real estate law, has appealed to us from a jury verdict suffered by him in the sum of $142,700.00. This sum, less a remittitur of $15,071.46, represented legal. costs expended by appellees, W. Luther and Elizabeth Hall, in the collection of a promissory note from a reluctant guarantor upon the note maker's insolvency.

The appellant participated on behalf of appellees in a somewhat involved sale of real estate in Montgomery County [1] in which appellees took back a purchase money promissory note in the amount of $352,000.00 from a corporate buyer which succeeded the individual contract purchaser, Milton Barlow. Anticipating the non-recourse

---

[1]. The case was removed and tried before a jury of the Circuit Court for Frederick County.

assignment by Mr. Barlow to one of his corporations, Prospect Properties, Inc.[2] (chartered for this transaction), appellant attempted in vain to obtain Mr. Barlow's individual endorsement on the note as surety. Mr. Barlow compromised by agreeing to endorse on behalf of The Barlow Corporation, another company of the "schizocarpous" Mr. Barlow. This was satisfactory to Doctor and Mrs. Hall, who then executed the contract of sale to which had been appended an addendum containing the following paragraph, among others:

> 4 " (b) The Barlow Corporation shall guarantee by endorsement the purchase money note."

Such endorsement was neither asked nor offered at the initial settlement on January 18, 1965, or subsequently when appellees subordinated their note to Prospect's construction loan. The absence of that endorsement has been the fulcrum of substantial litigation of which this case is the most recent.

In addition to consenting to the provision in paragraph 4 (b), quoted *supra*, Mr. Barlow orally agreed that he would provide The Barlow Corporation guarantee. Adding Ossa upon Pelion, appellant elicited from Mr. Barlow the following letter dated May 21, 1965 which was three days before the date of the subordination agreement:

> "Dear Mr. Glasgow:
>
> Paragraph 4 (b). It is my understanding that the Halls will produce at settlement their note to which there will be affixed an endorsement by Barlow Properties, Inc., [Barlow Corporation] guaranteeing payment.
>
> > Respectfully submitted,
> > PROSPECT PROPERTIES, INC.
> > by /s/ Milton A. Barlow
> > Milton A. Barlow
> > President."

---

2. Condition number six of the addendum to the contract of sale said "This contract may be assigned without personal liability to Milton Barlow."

When the news media publicized the insolvency of Prospect Properties, Inc. in late 1966 or early 1967, Mrs. Hall became concerned and called Mr. Glasgow. That he might more accurately respond to her inquiries, the note was obtained from her lock box and both attorney and client were dismayed to discover the absence of The Barlow Corporation endorsement, or any other for that matter.

Appellant precipitously made demand upon Milton Barlow for The Barlow Corporation's endorsement but he refused. Mr. Barlow's continued refusal to provide the corporate endorsement resulted in one of several suits filed by the Halls, and twice brought to the Court of Appeals, *Hall v. The Barlow Corporation*, 255 Md. 28 and *Hall v. Barlow*, 260 Md. 327. The latter case resulted in a judgment for the Halls against Milton Barlow in the full amount stipulated to have been due under the promissory note. It is ironic that it was Mr. Barlow's promise to provide a corporate endorsement in lieu of his personal guarantee that ultimately brought about his individual liability. Perhaps even more ironic was the fact that when Mr. Barlow was finally compelled personally to pay the note the solvency of The Barlow Corporation, whose endorsement he had refused to provide, was questionable.

After the judgment was affirmed by the Court of Appeals, the Halls received prompt payment of the stipulated amount due of $322,522.56. The damages the Halls now seek from Glasgow consist of the attorney's fees and costs of litigation expended by them to collect the balance due on the note. They total $127,628.54, represented by the final judgment below.

Appellant questions certain instructions to the jury by the trial judge and asserts as well that the judge erred in denying his motion for directed verdict. Since we reverse as a result of erroneous instructions to the jury we need only say that our review of the record satisfies us that there was sufficient evidence to permit a jury determination.

In *Kendall v. Rogers*, 181 Md. 606, 611, the Court of Appeals recited with approval the essential elements set

forth in *Md. Casualty Co. v. Price*, 231 F. 397, 401 (4th Cir.) necessary to recovery in a suit against an attorney for negligence. For subsequent analysis we bisect the second of these matters of proof, in order to treat its two parts separately. The prerequisites set forth were:

" (1) -The attorney's employment;
(2) -his neglect
-of a reasonable duty; and
(3) -that such negligence resulted in and was the proximate cause of loss to the client."

For the purpose of submission of the case to a jury evidence adequate to support all of the elements was available. The attorney's employment (1) was admitted but the scope of it was put in issue by the defense. Appellant claimed that the limitations of the employment raised a question of whether or not the scope of that employment (2) created a duty to obtain the endorsement.[3] That in itself became a jury question when testimony of the experts put it at loggerheads. Assuming arguendo that there was such a duty (and that it was neglected) we found ample evidence for a jury to determine that the missing endorsement resulted from the negligence.

On the issue of whether the loss was proximately caused, appellant contended in defense that The Barlow Corporation was insolvent and its endorsement would not have assured payment of the note, even if it had been obtained. Since evidence as to solvency was submitted by both sides the issue was subject to a jury determination and well set out by the trial judge:

"In order for a client to recover damages against an attorney for negligence, a client must show that the injury proximately resulted from the attorney's negligent act. That is really the basic point that you have to decide first and of necessity, therefore, the plaintiff must demonstrate injury, and in this case

---

3. See Appendix No. 1.

the Halls have to establish by this fair preponderance of the evidence that had they been able to bring an action on their note against the Barlow Corporation, they would have been able to recover against that corporation. That is, that the Barlow Corporation would have been financially able to satisfy the judgment obtained by the Halls against them. If you should find or if you are not convinced by this fair preponderance of affirmative evidence that they would not have been able to recover, then you should return a verdict for the defendant because, as I say, there is no real loss incurred by not having it, that guaranty on the note."

Thus the employment, the duty and the proximate cause were all contested issues with sufficient evidence on both sides to warrant their submission to the jury. We have intentionally withheld our discussion of the "neglect" portion of the element we dimidiated because it relates directly to the cause of our reversal. We hasten to note, however, that we do not question that the evidence of neglect was sufficient to submit to a jury since it is uncontroverted that the endorsement was never obtained.

### Neglect

The theory of recovery propounded by the Halls is that had appellant obtained The Barlow Corporation's endorsement, it would have met the annual payments under the note as they came due. It follows they would not have had to pay the $127,628.54 legal fees that it cost to collect the balance due on the note.

Appellant contended on the other hand, that even assuming it was his responsibility to obtain the endorsement, it had not been proven at what point in time the failure to do so became neglect. He pointed to the case of *Hall v. Barlow, supra,* and noted the Court of Appeals had already interpreted not only the very contract in question here but the precise paragraph calling for The Barlow

Corporation endorsement. He condensed part of the holding of that case into a prayer which he submitted to the trial judge for use as part of his instructions:

> "It has been established beyond contradiction that the promise made by Milton Barlow to affix the endorsement of the Barlow Corporation on the Hall's purchase money note survived the execution and delivery of the deed as well as the date of the execution of the subordination agreement, that is, January 1965 and May 1965 respectively. It is, therefore, well settled that the Halls did not forfeit or waive their right to have the guarantee endorsement of the Barlow Corporation by the fact that such endorsement was not affixed to the note by May 1965."

The appellant's theory was obviously that if Mr. Barlow's obligation to endorse was a continuing one, appellant's duty to obtain the endorsement likewise continued and the time by which he was bound to obtain it would be whatever the jury determined to be a reasonable time.

The judge's denial of that request may have been partially accounted for by his explanation to the jury that it was his practice to reject all specific instructions "but to try and embody in my oral instructions . . . the general principles the parties have given to me that I believe are applicable." However, not only did he fail to include the "general principle" asserted, his instructions set forth, as a matter of law, a principle diametrically opposite to the interpretation sought by the appellant. His instructions in that regard were:

> "Now, there is some contention in the case that the contract of sale between the Halls and Mr. Barlow did not have a date on it for the execution of this so-called guaranty by the Barlow Corporation. There is no specific date in that contract, *but I do advise you as a matter of law that the contract may reasonably be interpreted and should be reasonably*

*interpreted to mean that the guaranty should be on that note prior to the time that the subordination agreement was delivered to the new lender* because after that time the Halls had no means of, short of a law suit, of compelling the execution of that guaranty. Whereas, prior to the time that they signed and delivered the subordination agreement, they could have said, well, we won't do it until we get what the contract calls for.

So that it seems to me the contract, and *I instruct you, the contract should be interpreted to mean that the Barlow Corporation was obligated to place this guaranty on the note prior to the time that the subordination agreement came into effect.*" [Emphasis added].

The trial judge's mandated conclusion was actually a factual determination that was clearly the role of the jurors, not the judge. That it is the office of the judge to instruct the jury on points of law and of the jury to decide matters of fact is a maxim of ancient vintage.[4] In a case decided before our advent as a nation, *Rex v. Poole,* Cas. temp. Hardw. 28, it was held that it is of the greatest consequence to the law and to the subject that these powers of the judge and jury be kept distinct, that the judge determine the law, the jury the fact; and that if ever they come to be confounded, it would prove the confusion and destruction of the law. *Accord, Metropolitan Railway Co. v. Jackson,* Law Rep., 3 Appeal Cases, 197; *Phila., Wilm. & Balto. Railroad Co. v. Fronk,* 67 Md. 339, 343.

The instruction here preempted one of the basic questions to be decided by the jury, *i.e.,* assuming the jury found, as they must have, that it was appellant's duty to have obtained the absent endorsement, when if at all, was it neglect for having failed to do so?

In appellees' suit against Milton Barlow, Mr. Barlow argued an interpretation in the Court of Appeals analogous

---

4. "*Ad quaestionem facti non respondent judices ad quaestionem leges non respondent juratores.*" 8 Rep. 308.

to that proclaimed by the trial judge's instruction. The instruction here would require endorsement pursuant to clause 4 (b) prior to delivery of the subordination agreements. Mr. Barlow argued that his obligation to endorse was waived unless performed prior to the delivery of the deed. *Hall v. Barlow, supra.* The Court of Appeals decided to the contrary. It held that the agreement to endorse was a continuing obligation "which survived both the settlement date as well as the date of execution of the subordination agreement." On behalf of the Court, Judge Finan reasoned:

> "It is inconsistent and unreasonable to construe the contract as requiring performance of such provisions prior to delivery of the deed, merely because the descriptive term 'conditions' had been applied to them. If such a construction prevailed it could only mean that a substantial portion of the agreement was subject to being frustrated because of the deliberate use of inconsistent provisions in the contract. We do not believe reasonable men would so intend. In *James v. Goldberg*, 256 Md. 520, 527, 261 A. 2d 753 (1970), we recently had occasion to say, ' * * * We must determine the intentions of the parties from the language of the contract itself, not by what a party to the contract intended it to mean, or thought it meant, but 'what a reasonable person in the position of the parties would have thought it meant.' *Chesapeake Isle, Inc. v. Rolling Hills Development Company, Inc.*, 248 Md. 449, 453, 237 A. 2d 1, 3 (1968).'
>
> We think each of the provisions in the addendum must be viewed with reference to the contract as a whole, and where the contract states that 'the provisions' of the contract 'shall survive the execution and delivery of the deed,' the mere designation of a promise as a condition does not necessarily make it one. There are no doubt some provisions in the addendum which were conditions,

such as the necessary rezoning; however, again, we think each provision must be interpreted while viewing the contract and addendum as a whole.

Having determined that *paragraph 4 (b) of the addendum was not a condition but a contractual promise (which survived both the settlement date as well as the date of execution of the subordination agreement)*, whereby Milton Barlow impliedly warranted that The Barlow Corporation would endorse the purchase money note, we come to the final question as to whether Milton Barlow breached this warranty. We think that he did." [Emphasis added]. 260 Md. at 343.

The instruction in the present case that "as a matter of law ... the contract should be interpreted to mean ... that the endorsement should be on the note prior to the time that the subordination agreement was delivered," was on its face contradictory to the preceding interpretation.

Apparently the trial judge had decided that the subordination agreement was an additional extra-judicial lever available to the Halls to induce Mr. Barlow's execution of the endorsement. We do not quarrel with the reasonableness of that conclusion. The jury would have been free to find that the subordination agreement was such an inducement, and that Mr. Glasgow forfeited that inducement by not insisting on the endorsement prior to delivery of the agreement. So finding, it could well have found negligence notwithstanding the continuing legal obligation of Mr. Barlow to endorse. The error here became manifest when the trial judge removed that and similar choices from the jury's consideration, and elevated to a "matter of law" his own factual conclusions on those questions, as well as his view on the continuing vitality of the Barlow obligation — a view which directly contradicted the Court of Appeals. *Hall v. Barlow, supra,* 260 Md. 327.

There is an additional factor which should be considered in analyzing the alternatives Mr. Glasgow faced and determining whether he acted negligently. It seems

apparent that if the agreement to endorse was not conditioned upon subordination, *Hall v. Barlow, supra,* neither was the agreement to subordinate conditioned upon the endorsement. The Halls had contracted to subordinate, just as Mr. Barlow had contracted to endorse, and thus had a continuing contractual obligation to deliver the agreement.

The trial judge should at the very least have instructed the jurors that if they found a duty by Mr. Glasgow to obtain the endorsement that duty should have been exercised with a reasonable degree of diligence.

> "*An attorney is liable to his client for* the possession of *a reasonable* degree of skill in his profession as well as for the exercise of a like *degree of diligence in the conduct of the transaction about which he is employed.*" *Watson v. Calvert Bldg. Ass'n.,* 91 Md. 25, 33. [Emphasis added].

The "reasonable degree of diligence" standard under the circumstances of this case was the subject of expert testimony by both sides. That testimony taken in the light of *Hall v. Barlow, supra,* did not foreclose the possibility that the jury may have found that Mr. Glasgow's solicitation of the endorsement, attempted subsequent to Prospect Properties' insolvency, was an exercise of "a reasonable degree of skill ... as well as ... the exercise of a like degree of diligence in the conduct of the transaction about which he was employed." *Watson,* 91 Md. at 33. Even appellees' expert buttressed that possibility.[5] Because the judge may not have

---

5. One expert witness who had remained in the courtroom pursuant to the procedure approved in Consol. Mech. Contractors v. Ball, 263 Md. 328, was called by appellees to express his opinion on the "obligation or ... standard required by Mr. Glasgow ...." The essence of the expert testimony was directed at whether there was a duty upon appellant to obtain the endorsement, and if so — when. Instances elicited on cross-examination follow:

> "Q Now, where in the contract of sale is it required that the promissory note bear the endorsement of The Barlow Corporation in January of 1965?
> A It stated as a condition, and it would be a continuing obligation of — the better practice would be to have it done at that settlement.
> Q Well, but —

agreed with the reasonableness of such a conclusion, he had no right to foreclose it from the jurors as one of their alternatives.

> *Judgment reversed; case remanded for retrial; costs to be paid by appellees.*

## Appendix

Appellant's defense relied primarily upon the scope of his employment, *i.e.*, that he had been sporadically hired to perform a series of services rather than retained to assume the total responsibility for the entire transaction. From this premise he raised the questions: whether the obtention of the endorsement was his responsibility, and if so, was not

A — But it could have been done subsequently and still conform to the contract, if that's what you mean.

\* \* \*

Q So isn't it fair to say that there was no requirement for The Barlow Corporation to endorse that note until the subordination provisions of the contract went into effect?

\* \* \*

WITNESS: It could have been placed on there subsequently, yes, and still have been in conformity with the contract.

\* \* \*

A I think that's correct, yes.

Q Now, Mr. Bullard, have you examined the letter of May 21, 1965?

A Yes, sir.

Q And that letter commits The Barlow Corporation to endorsing the note at the time of subordination, assuming that the Halls produced the note, does it not?

A Could I see it? — is —

(Supplied)

WITNESS: Yes, it does.

MR. EHRMANTRAUT: And that created a continuing obligation to furnish the necessary endorsement on that note, isn't that correct?

A That's correct.

Q And that's what the Court of Appeals said, isn't it?

A Right."

It is apparent therefore that the point of time beyond which a duty to obtain the endorsement would have been "neglect of [that] duty" was not established without equivocation even by appellees' expert, that in itself would not have made it any less a question for jury. The Court of Appeals "has observed that an expert's opinion is of no greater probative value than the soundness of his reasons given therefore will warrant." A. H. Smith Sand and Gravel Co. v. Dep't Water Resources, 270 Md. 652, 667.

the effort refused by Mr. Barlow together with the letter of commitment from Mr. Barlow sufficient fulfillment of that responsibility. Only if these were resolved against him would he reach the questions: whether his failure to *compel* Mr. Barlow's "continuing promise" to endorse constituted negligence, and if so, after what point in time did it become negligent.

The facts upon which appellant relies for the scope of employment issues are in essence a chronology of his employment. Briefly he notes:

1. First contact with the Halls was through a realtor, Thelma Edwards, to provide rezoning for the property subject to putting it on the market for sale. That service was concluded successfully and paid for by the Halls.

2. The next involvement came after the Halls rejected a proposed contract with Mr. Barlow submitted through Mrs. Edwards who again recommended Glasgow to the Halls for their protection in renegotiating the contract. It was at this phase when appellant extracted Mr. Barlow's agreement to endorse on behalf of The Barlow Corporation. The contract of sale was executed.

3. Settlement was scheduled by Mrs. Edwards at a title insurance company office for January 5, 1965. She advised the Halls to contact appellant. They did not do so. The settlement was aborted because of a title problem. Thereafter Mrs. Edwards solicited the advice of appellant to overcome the title difficulty and proceeded on her own to do so (the obtention of a quit claim to a well easement by heirs of a former owner).

4. The settlement was rescheduled at the title company office for January 18, 1965. Again appellant was not asked by the Halls to be present. Nevertheless, Mrs. Edwards called

him from the title company and requested his presence "to inspect the quit claim deed." This interrupted his own schedule, however, since the title company was just across the street, he agreed to "slip over." He received the quit claim deed and "check[ed] out the math" on the settlement sheet, but because he had interruped his schedule was compelled to return to his office prior to the conclusion of settlement. Before leaving he approved the Halls "sign[ing of] the papers," asked the settlement officer to "take care of . . . some papers that were not ready," (presumably the note and deed of trust which were to be prepared in accordance with his instructions), and advised the Halls to obtain the instruments when prepared.

5. Some months later appellant was asked to review the subordination documents pursuant to which he obtained from Mr. Barlow his post dated letter of May 21, 1965, recommitting The Barlow Corporation endorsement on the note.

6. On May 27, 1965 at appellant's office *Mrs.* Hall signed the subordination agreement and it, along with Mr. Barlow's letter as well as all other documents related to the subordination were turned over to Mrs. Edwards for her to "be about getting all the signatures that were required," including Dr. Hall's. Mrs. Edwards obtained them one by one by going to each person involved.

7. Two days later, May 29, 1965, Mrs. Hall received the note in the mail from the title company after twice calling them for it. Pursuant to Mr. Glasgow's instructions at the January settlement she deposited it in her safe deposit box and did not see it again until 1966 or early 1967 when the news media reported Prospect Properties' financial problem.

Appellant contends that these facts which we have appreciably condensed relieved him of responsibility to perform the "ministerial act" of obtaining the endorsement. Appellees contend that it was his responsibility and he failed to do so at all. They add that his attempt when he called Mr. Barlow in 1966 or early 1967 at the urgency of Mrs. Hall was too late. Both parties produced expert opinions relating to the issues so raised.